First matter is Grant v. Lockett. Mr. Cox, are you ready? Good morning. May it please the Court, I'm Roger Cox, representing Appellant Tyboo Grant. I'd like to reserve two minutes for rebuttal, if I may. Okay. In this case, there was a murder in Pittsburgh in January 1997 in front of a bar called the Waretsat Bar. We know the facts. Why don't you just get right into your argument? Yes, Your Honor. The critical witness at trial for the Commonwealth was a man named Christopher Moore. He was the only witness, in fact, who inculpated the defendant at all. All of the other eyewitnesses – well, he wasn't an eyewitness. The actual eyewitnesses actually said it was not Tyboo Grant. They failed to identify the defendant as the shooter at all. Who were the witnesses that saw the first gunfire, the first gunshots? There were several that saw the second one, right? Was there anybody that saw the first gunshots? Your Honor, I didn't separate it in my mind that way. Yes, there were – Well, it's important because the fatal shot was the first shot, not – That's correct. Not the car right by. That's correct. Then there was, five minutes later, a drive-by. Right. Actually, the car that did the drive-by shooting came by and let out the shooter, obviously, went around the corner, and he came out first and on foot emptied a magazine and then went away. But quite a number of people saw both incidents. Moore saw the second and the first because after the first, people emptied out of the bar to see what was going on. Mr. Moore told us – I'm sorry to interrupt, but is it Kim Oden? Did she see the first exchange? Do I have the wrong name there? Kim Oden was there and did see the first exchange. The first one, okay. That's correct. And she's mentioned in Crystal Gilliam's testimony as well. She is the wife of the gentleman who was killed. She said the guy had a ski mask on and 5'11", gave a physical description very different from Mr. Grant, who's apparently very short. That's correct, Your Honor. And there was a difference with respect to what they were wearing in terms of the different – Like all eyewitness testimony, Your Honor, there are various slight differences in testimony between the different witnesses. Slight gig, I thought, in terms of the clothes they were wearing. Yes, ma'am. Some people had them with cornrows and some people had them with braids and so on. Well, Kim Oden was the only one who saw a ski mask or said there was a ski mask. That's correct, Your Honor. Now, she didn't testify at trial. She wasn't called by the Commonwealth. Right. But cornrows and braids are not inconsistent. Some people might see cornrows, especially if they're not super tight, and say they're braids. That's correct, Your Honor. The key issue in this case, though – I mean, the facts are very clear as to who testified to what and who saw what – is that none of these eyewitnesses saw Mr. Grant. And Mr. Christopher Moore is the Commonwealth's only witness, and he tells a rather peculiar story, that he's coming out of his apartment at 1407 Lincoln Street, which is about 300 feet from the scene of the shooting, and he hears shots and he looks over and he sees somebody who he could not identify wearing a blue coat firing in the lot of the open pantry, and then – which is across the street from where it's at bar. And then he sees Tybu Grant walking – coming down the street and yells at Mr. Moore that he just had to shoot these people, or words to that effect. And that's it. That's the whole of the government's case against Tybu Grant. Leaving aside the many, many problems with the veracity of Mr. Moore, the prosecutor was – there was a discussion on the record in the court, between the court, the prosecutor, and defense counsel, about the record of Mr. Moore. And the defense counsel says, I've asked the prosecutor to run his record, and they get into a discussion that there were only two old 1983 convictions for burglary and possession of stolen property. But you've got a problem there under Edberg, because the defense counsel who could have found that out was that he himself, and they subsequently did by running the record, the defense counsel later on did, using the same vehicle available to counsel before trial, came up with this later criminal faulty offense. And more importantly, it seems to me, the fact that Moore is on parole the time he testifies.  Well, I agree also, Your Honor. The court wasn't informed. The jury never heard that he had this prior criminal record, two serious felony offenses, but they also didn't hear that Mr. Moore was on parole at the time of his testimony. What do you make of the fact that he's on parole? How does that – how is that relevant to what's before us? Well, Your Honor, it gave him an incentive to cooperate with the government. A parole officer has enormous power over a parolee. Now, the government in its brief claims, well, the defense never proved that there was any parole proceedings going on or he was in any kind of trouble. Well, that's right, because they never told the defense anything. They didn't even tell the defense Mr. Moore was on parole. Granted, it's a public record. But as far as whether there were any proceedings, he's not getting a lot of this parole officer or whatever, we can't know because they didn't tell us. Well, but then as to – there are two problems, the Brady and the Sixth Amendment Ineffective Assistance Claim. As to Brady, I'm not sure how far you can go with that because of the fact that you could have disclosed that. When I say you, I don't mean you. I know you weren't trial counsel. Trial counsel could have found out the fact of parole and used that for impeachment himself. Easily. But it's the ineffectiveness. If you can focus on that, how does that – the fact that defense counsel at trial did not discover the fact of the only witness who says that Grant was the shooter was on parole. Well, that's correct, Your Honor. The fact that he was on parole was easily available in the clerk's office and state police records. Defense counsel was essentially brain dead. He just went through this case by the motions, did absolutely nothing. He didn't file a single motion. Was he appointed counsel? He was an Allegheny County public defender, an employee of the organization. We know they have investigators there, but no investigator was ever assigned. Nobody ever interviewed any potential witnesses in this case, didn't file a Brady motion, didn't look up the record of the key witness. These are all rather obvious things to do. I was surprised, in fact, because it struck me, and the same thing in terms of the quality of the defense counsel, but maybe it's the old broken clock being right twice a day. During the closing argument, he made a very astute and really sophisticated objection when the prosecutor was basically saying, well, where was he going? And there was an objection which was sustained basically saying that the prosecutor was suggesting that Grant had an obligation to explain to the jury where his whereabouts that night, which when I read the statement of the prosecutor, I initially picked that up myself. So I wouldn't say brain dead is a fair characterization, but that doesn't necessarily mean that Strickland survives either. Well, I agree, Your Honor, from what you said, but he did as little as possible. I mean, he thought on his feet in the trial as any good lawyer is going to do, so his cross-examination was very good. So you concede he was a good lawyer? Only to that extent. You said that any good lawyer is validated. I mean, I've never seen anybody that I would call a good lawyer who in a first-degree murder case does no investigation at all and doesn't even file a Brady motion. Also, this was a rocket docket case. I mean, the shooting took place in January, and just a few months later we have this first-degree murder trial. Nobody makes a motion to extend time for the trial or anything to do further preparation, which would have been granted, as we know, in such a serious case. But it just doesn't seem to have occurred to this lawyer, Mr. Gardner, to the necessity of finding out what the facts are from the defense's point of view, for example. There's one police report, I remember, that mentions another eyewitness, not called to trial, not mentioned at trial. Pittsburgh Police Department's reports are noteworthy for never saying much. It just says that she was interviewed. What did she say? Who knows? We don't know. Nobody ever went to see her. I would have wanted to see her if I were trial counsel. Was that Gee? That was not Gee. Was that Oden? No. There's another person who's never mentioned, not Oden, not Gee. It never came up. I couldn't do anything with it because I'm not allowed to do any discovery investigation at the 2254 stage. The record is in cement at this point. It just showed me, though, that nobody cared. But you concede, then, part of what you're arguing is that there was an error on the part of the district court to not hold a hearing. It sounds like you're conceding that under Penholster that that really is not error, that the district court was in a position where it could not hold a hearing. AEDPA has evolved or devolved, you might argue, to the point where it has to be submitted on a state court record unless the state court decided it only on state law. There's really not much that can be done in a federal court by way of a new hearing. That's right, Your Honor. Okay. One thing I would like to mention that nobody in this case seems to have noticed is that there was never any discovery as to Christopher Moore. Here's a critical witness. The Commonwealth must have a police report or something in writing memorializing his interview or interviews. It's never disclosed. I have no way today of finding out what that is. There's this enormous number of cases out there, including Smith v. Cain, a recent Supreme Court case under Brady, where the court finds that there's this undisclosed stuff that's later discovered. Well, where's this file that's never later discovered as to Christopher Moore? There must be one. Where is it? We never saw it. Was it subpoenaed or was there a Brady request? Trial lawyer didn't do anything. Didn't ask for all paper. Didn't ask no broad discovery question. There were no motions at all of any kind. Say that again. There were no motions of any kind? No of any kind. No motions at all. The docket doesn't reflect a single motion filed by the defense. Nothing to preclude Moore's I.D. given he was 300 feet away, which is the length of a football field, and he sings a relatively small stripe on the shooter's clothing. Nothing to preclude that I.D. No, Your Honor. No, absolutely not. It really is a shocking case. Mr. Moore's testimony is strange. Another thing nobody seems to have noticed is there was a Commonwealth witness named Mr. Gilbert, who hears the shots, who claims he sees Mr. Moore walking toward him at the corner of Manning and Montezuma immediately afterward. And there are some words exchanged, nothing inculpatory that you could say yes, you know, he confessed to shooting him or anything. And he tells Mr. Grant to go chill, and Mr. Grant goes on down the street. At the very same moment, Mr. Moore's testimony is that he sees Mr. Grant walking down Lincoln Street, another street altogether. So who's telling the truth, Mr. Moore or Mr. Gilbert? Nobody seems to have noticed the fact that you can't be in two places at the same time. Was that referred to in the lawyer's colloquy at all? I don't understand, Your Honor. I'm sorry. Well, was that, the point you just made, was that made by trial counsel also? It was not, Your Honor. He didn't notice it.  Was trial counsel the defenders, the public defender? He was, Your Honor. Well, he wasn't the public defender. He was an assistant public defender. It's a good office. I mean, I know generally, especially amongst defendants, when I was trying cases, they would always say, I don't want this guy, I want to get a lawyer. I'd say, you have a lawyer. They'd say, no, I want a real lawyer. But public defenders are some of the finest criminal, certainly in Philadelphia this is true, and the Allegheny office is a very fine office too. That doesn't mean there are certain exceptions within that office that might not measure up to the standard of the office. And Gilbert says he saw Grant shortly after he heard the gunshots. That's right. Gilbert yelled to Grant, and Grant said, they were just dumping on us. That's right. That's right. We don't know what that means exactly. Right. I understand. Not the same as the statement to Mr. Moore. But, you know, this is really a very small slice of time here. Yeah. I mean, whoever did the shooting goes somewhere, whether it's Mr. Grant or somebody else, and then gets in a car and comes back five minutes later with at least two associates and shoots up the place again. So, you know, there's not a lot of time for people to be saying something on one street and saying something on another. So either Mr. Moore is telling the truth or he's not. There's not a whole lot of room there. Okay. You saved some time for rebuttal. I did, Your Honor. Excuse me. I just wanted to double-check. So that your principal position is in effective assistance of counsel? Yes, Your Honor, plus the Brady violation. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Leigh Ann Shipley, on behalf of the Attlees, Melvin Lockett, and the Allegheny County District Attorney's Office. I understand that this wasn't the strongest case that my office has ever had. Well, you got that right. It's certainly true. We have a bar shooting where there were many people around, and we only have one eyewitness who identifies Tyba Grant as the shooter. From how far away? From a significant distance, a block away. 11 o'clock at night. Yeah, a football field. Two lights. And he happens to be on parole, which the jury doesn't know. Yes, he's on parole, but he's not facing a parole violation. He's not facing new charges. He's not on the issue. Can you show me any case, any case at all? Don't limit yourself to Anglo-Saxon jurisprudence. Go beyond that if you want to look at the cases coming out of Eastern Europe, out of some of the developing tribunals in Africa. Can you show me any case that says where a witness has a subjective reason to lie? That's not relevant in terms of the jury consideration, unless that subjective reason to lie has bloomed into fruition in terms of a formal agreement with the prosecutor as the state court seemed to require here, which I never seen. I was blown away when I saw that. The state court said, well, you didn't show there was a deal with the prosecutor. Well, of course not, because what prosecutor in the right mind is going to say there's a deal. That's true, Your Honor. This is very different than most of our cases where we use people who are on parole or people who are jailhouse snitches, if you will. This is a man who was on parole for a drug violation. So the conviction itself was not crime and falsity. The drug conviction that he was on parole for could not be admitted into evidence against him. This is very different from a lot of our cases because, again, he wasn't facing- I'm going to ask you, Davis, how does that help you? If the witness thinks that it's in his interest to lie, what difference does it make if his underlying conviction is crime and falsity or not? Because I think you're absolutely right about that. That's not admissible for the fact of what you usually use a crime and falsity conviction for to impeach. But the fact that he has reason to create a favor with the prosecutor, my guess is, and the defense counsel didn't bring this out, but it's argued in the brief, that him going bar hopping, which he really was because he hits one bar, he goes back to his apartment, and then he moves on over to another one at 1 o'clock in the morning, is almost certainly a violation of his parole. And you're right, but that's the reason why I believe that he had every reason to be honest with the police and with his testimony at trial. Oh. He had no reason- I'm sorry, Your Honor. No, I just commented. No, I had the same comment. I suppressed mine, but I had the same reaction. Honestly, I don't think it was in his best interest to admit to police that he was out bar hopping and violating his parole, and yet he did. So what do you do with that? He argued to the jury. That's what you argue to the jury. You let the jury know this guy's got a reason to lie, but he didn't hide it in not being out there. He told them that he was out there that night. He fessed up to his conduct. He admitted that he was in violation of his parole. And I submit to you, ladies and gentlemen, that's every reason why you should find his testimony credible. Let the jury decide, well, should we believe more or not? Because without more, there is absolutely no case. I went through the closing argument of the prosecutor last night, and, I mean, it's understandable, but the extent to which the prosecutor hangs the case on more not having a reason to lie, that was why the prosecutor honed in on it. And, again, it's totally understandable. That's what a good lawyer would do. But he says over and over again that he had no reason to come in here, he had no reason to get up on that witness stand and identify Mr. Grant as the shooter. He could have gone on about his business. What reason does he have to lie? Well, there's an obvious answer to that that no one knows about. He's on parole. And I don't know that just because the fact that he's on parole automatically gives him a reason to lie. Have you read Alaska v. Davis? I have. Okay. Do you have any problem with what the Supreme Court said there? Because we're kind of bound by these things the Supreme Court hands down from time to time. We kind of take those things seriously. I understand that. And there it was even a weaker case, because there there was a countervailing policy against using a juvenile conviction. The Supreme Court said that the strength of the possible motive to lie, the bias that arises from being on derogatory probation, is so great that it's got to override the state's interest in maintaining the privacy of juvenile convictions. You've got to, in order for the defendant to get a fair trial, the jury has to be able to know that the guy's on derogatory probation when he testifies. And that's probation. What could a juvenile probation violation get you? Here you've got an adult parole violation for a drug offense in Pennsylvania. Your Honor, I understand your concern. Here's my frustration with the case. We're constrained by the record. I don't think it's clear that my office didn't turn over the fact that Mr. Moore was on parole. Let's assume you did. Yeah, I think that's exactly right. Or at least you didn't hide it. Yes. Brady goes away. That gets you off the Brady hook. Right. Puts you right on the circling hook, though. Where did Mr. Moore come from? How did Moore, yeah. How did you find Mr. Moore? You just kind of stumble in one night and say, hey guys, I can help you out with this case. Apparently at 5 o'clock in the morning after the shooting, several hours later, he decided to come to police and tell them what he knew. Well, the bars were on close there. Yes. You know, I know Mr. Parker, the defense attorney in this case. He's a very good attorney. He did not try this case perfectly. I will admit that. But I think he did his best. And I think the record reflects that he actually did try to do his best. We're not giving out stickers. That's not the point. You're right, Your Honor. That's very good. I guess what I'm arguing is when you look at the record as a whole, it's very clear to me that he did his best with this case. It may have been a strategic decision not to bring up the fact that Mr. Moore was on parole. Why? I don't know. I mean, it seems to me you can't just say things. You're right. And I'm working with a very limited record. I wish that I could go back to 1997 and know what happened, and I wish that I could know what Mr. Parker was thinking. But I don't know that I agree that by not questioning Mr. Moore about the fact that he was on parole, that changed the outcome of the trial. I don't know if it rises to the level of an infectious disease trial. No, but that's not the test. And you're right, this is before your time, but we can't get into Mr. Peabody's Wayback Machine. But it seems to me it has to undermine confidence in the case because you've got a single identifying witness who didn't see his face. You've got four or five people who did see the face of the shooter. They say it wasn't Grant. And that they knew Grant. And one of them knew him for 10 years. They knew him for 10 years, so Grant wasn't the shooter. You've got another witness who says that the shooter was 5'11", who was closer than 300 feet away, 5'11", and had a hood on. He couldn't see the face because he had a hood on. But the physical description does not come to a, I guess Grant is what, 5'4", 5'5", in slight of build. The descriptions are all over the place. And in meeting the prosecution's closing argument, my goodness, that doesn't, I don't know what he was arguing. That's just all over the place. It's, I think you'll agree, and I've got to commend you for your integrity, Mr. Peabody. I don't think you've been here before, but you're in a bad position, obviously. You've got this record, you stuck with it. And you're not trying to make frivolous arguments because you're the prosecutor and you're here to win. And I really commend you for that. But I just don't get it. It's one of the few cases, speaking only for myself, and we haven't conversed the case. It's one of the few cases where you see it and you think, my gosh, they got the wrong guy. Usually it's, well, yeah, they got the right guy, but there are all these technical problems with the conviction, and therefore, the issue becomes, as the EDPA threshold here met. Here, it's not that simple. It's like, they got the wrong guy in prison during life for this shooting. Four people said he's not the shooter who saw his face, I think it's four. The only guy who says it's Grant, didn't see the face of the shooter, has a reason to say it's Grant that the jury never knows about. That's what I don't understand. What's the reason he has to say it's Grant as opposed to somebody else? I don't think he has any motivation to make up the fact that it's Grant. Was there any chance that it was he? Right. I have to be honest, Joan, I never considered that. One always considers that. The defense counsel clearly didn't consider it. Here's the frustrating thing I find. Working in Pittsburgh, dealing with a lot of these usually gang-related homicides, it's amazing how many witnesses will say, I saw the shooter, and I don't know who it was, but it wasn't the defendant. And I feel like that's what's going on with a lot of the witnesses here. And the witnesses that you're talking about are witnesses who saw a passenger in the car, not the person who fired the initial round of shots. Well, but it's pretty clear whether there were four people in the car or three people. Four people, I believe. And not everybody's identified in the car, but the faces in the car who are identified are clearly not Grant. Their fingerprints in the car are only two different people. Neither of them are Grant, and none of that mathematically excludes the possibility of Grant. We can see that being in the car. We've got 15 cartridges that are recovered, all coming from in front of the bar. None of them come from before the fatal shot was fired. If this is the best that we can hang a criminal conviction on, it seems to me none of us are really safe. Unless we just don't go outside our doors at night. I understand that it's frustrating. I also understand that we can't put ourselves in the place of the jury, that there were 12 people who heard the testimony of Christopher Moore and all the other witnesses, including witnesses who said that Tyboo Grant was not the shooter. But isn't that exactly the point? Wouldn't it have been helpful if the jury, in hearing the testimony of Moore and the testimony of the other witnesses who say it's not Moore who was the shooter, wouldn't it be helpful if they knew that, my goodness, Moore has a reason to kiss up to the prosecutor. The guy's on parole.  He's not going to kick off the prosecutor. And Moore may believe that if he testifies, Moore clearly knows who the prosecution wants to identify in this case. It's Grant. He's the guy. So wouldn't it make sense to someone who's trying to keep their own person out of prison, if they say, yeah, you're right, you got the right guy, I was out there and didn't see his face, but later on he basically admitted to me that he was the guy who fired the shot. Honestly, I believe that Mr. Parker, as defense counsel, did his best to discredit Mr. Moore's testimony. Well, he did with what he had, but he didn't have the thing that was the most important thing. It's like saying, taking your car into the mechanic, and the mechanic's got a screwdriver and no wrench, and in order to fix the car, he needs to tighten the nut. So he's tightening all the screws and going around. The mechanic did the best he could to fix the car with what he had. He had a screwdriver, but he needed a wrench. It seems to me defense counsel here needed the information about the parole violation, and I don't know how you get past, I can't speak on it myself, I don't know how you get past Strickland on that. You may have the right guy, who knows. You may have the right guy, but that's... By accident. By accident, yeah. It's like the broken clock theory. Do you want to comment, too, about the inconsistency between Gilbert running into Grant and Moore running into Grant? Your Honor, all I can say about that is there are often, in cases like this, inconsistencies between witnesses, and that's up to the jury to decide what testimony they believe. I do a lot of appellate work, and we cite all the time the fact that a jury can believe all, some, or none of any particular witness's testimony. They are to evaluate the credibility based on what they see on the stand. Was Moore's criminal history part of the record before the Superior Court when it reviewed Grant's PCRA petition? Your Honor, it's interesting. It was not made a part of the record for the post-conviction court. Appellate counsel from the PCRA then amended the record of the Superior Court and submitted additional information about Mr. Moore's criminal history. So yes, they did have that information when they decided the case. So when they meticulously reviewed the State Court record where the State Court said the evidence of the parole was never introduced, and the Supreme Court meticulously reviewed and thoroughly searched the record, they just were wrong. Somehow in their meticulous review, they missed the thing that was most important to their inquiry. The fact that the evidence was sitting there in front of them, and the State Court judge said, you never introduced this evidence. Well, Your Honor, procedurally this case is very strange. Everything about this case is very strange. It really is. You know, this is the case that seems to go on forever, but procedurally it's interesting because this claim was initially raised on direct appeal. And that's when the Superior Court said, you didn't introduce enough evidence. The Supreme Court then took the case and set precedent in Pennsylvania by deciding a Commonwealth fee grant to make ineffective claims to be raised on in PCRA. And it was not until the PCRA appeal that the Superior Court got the full record about Mr. Moore's criminal convictions. So some statement, I think it's in a footnote. In the State PCRA opinion, maybe I'm wrong, I just never heard this before, that this went to Ogden and Gee that you couldn't show that defense counsel was ineffective for failing to call them unless defense counsel could show that the witness was willing to testify. Is that the rule in Pennsylvania? Yes. What about a subpoena? I mean, you're saying that unless the witness is a willing witness, defense counsel can't use them? Isn't there a little bit of a due process issue there? Well, I mean, certainly we encounter plenty of cases where witnesses know something about the case, and even if they're subpoenaed, won't be truthful about what they see. Well, but that's true. I understand the defense counsel does not want to tick off a witness, and you might want to put, if a witness says, I don't want to testify, counsel is then going to have to decide, do I run the risk of putting this person on the witness stand angry at me and take a bullet because of it, or am I going to put him, force him to testify and then do the best I can with whatever the witness says, because it may not be able to lock him into a prior statement, it may not be able to get a prior statement out of a witness, or you have to go cold, and that's scary. But still, to require a rule where in order to show counsel is ineffective, by not calling a witness, the defense has to show that the witness was willing to testify, that certainly is a huge due process issue. When I was a state judge for 10 years and did nothing but trials for 10 years, three years, nothing but homicides, I never heard that rule before. It just struck me as absurd. I don't know if it's absurd, actually. I think in this case it's actually very good. Absurd is too strong a word. How about unconstitutional? Well, that's a different issue. But I think here there's a very practical problem here. When you talk about Kim Ogden, she stated that at the time that this homicide happened, she was in fear for her life, and she was afraid to testify. But that doesn't help me because the prosecutor hemmed in on the fact that Moore was the only one who had no fear. Everybody else was out there, they were afraid of being shot. Their chances of misidentifying someone and not seeing the person accurately is pretty high because they're in the line of fire. But Mr. Moore, good old reliable Mr. Moore, he was 300 feet away from a drunken stupor, on his balcony looking down into the scene. He wasn't afraid of being shot, so you can believe him because he has no reason to lie. That was the thread of the closing, and it's a good closing. It makes a lot of sense, except for, again, the fact that I don't want to belabor the point, but you understand our concerns and your light is on. You said you did a lot of thought work. Have you appeared before me before? I don't remember you. I have not, Your Honor. Okay, well, we'll be back again with a better case to work with. I'm sure she'll come running back. Well, thank you very much. I appreciate that. Thank you, Ms. Schiff. Thank you. Well, he just did your... Rebuttal for you. In none of those decisions do any of the State Courts seem to understand this case. None of them pay any attention to the fact that we have all these eyewitnesses who didn't identify Tybu Grant, and that Mr. Moore is the only critical witness for the Commonwealth. Like a Sherlock Holmes story. The doll that didn't bark. Well, part of it, of course, is that Mr. Grant had bad luck with appointed counsel. I mean, these people were not of the most admirable stature in our bar, unfortunately. Nobody's briefs... Please don't denigrate the Public Defender's Office. I mean, nobody's briefs seems to... The only people who don't respect the public defender is the people with medics had them representing them. They're incredibly fine, dedicated lawyers. And you might have, within an office, a public defender, an assistant public defender who's not up to the level that generally public defenders are, but they're an incredibly talented group of attorneys. Well, he had... And very dedicated. Very dedicated. I agree, Your Honor. I myself am not being paid by the defendant. So, there are many fine people doing this. But he had the bad luck of the draw, unfortunately. Nobody emphasized to these courts the importance of Mr. Moore in light of the fact that there's no eyewitness to say that Mr. Grant did it. There's only Mr. Moore who didn't see what happened, except from a long distance away, and he couldn't identify the shooter. So, I respectfully submit that... And if you read page 2 of the Supreme Court's opinion, 2002 opinion, as to Mr. Grant, it's very confusing as to why they don't find a Brady violation, for example. Well, they're not looking for one because they don't understand the facts of the case. It's clear that they don't. And I submit to the court the key to this is that all of the cases decided by the state courts for Mr. Grant were contrary to or are an unreasonable application of settled federal law. Thank you. Thank you. Thank you. I'll take the matter under advisement. We thank you for a helpful argument. And, Mr. Floyd, I do commend you. I'm going to beat up on you a little bit. I do commend you for the job you did today. Thank you, Your Honor.